IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : CHAPTER 11 |
| | : |
| **LANDSOURCE COMMUNITIES** | : Case No. 08-11111 (KJC) |
| **DEVELOPMENT LLC,** *et al.*, | : |
| | : (Jointly Administered) |
| Debtors. | : |
| | : |
| **THE NEWHALL LAND AND FARMING** | : |
| **COMPANY (A CALIFORNIA LIMITED** | : |
| **PARTNERSHIP),** | : |
| | : |
| Debtor, | : |
| | : Adv. No. 09-51074 (KJC) |
| v. | : |
| | : |
| **AMERICAN HERITAGE LANDSCAPE,** | : |
| **LP, C.A. RASMUSSEN, INC., GRANITE** | : |
| **CONSTRUCTION COMPANY, and** | : |
| **R&R PIPELINE, INC.,** | : |
| | : |
| Defendants | : |

## MEMORANDUM

BY:   KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

Before the Court are cross-motions for summary judgment filed by Plaintiff, The Newhall Land and Farming Company (A California Limited Partnership)[1] ("Newhall"), and Defendants American Heritage Landscape, LP and R&R Pipeline, Inc. (respectively, "AHL" and "R&R" or, jointly, the "Defendants"). Newhall asserts that the Defendants do not hold valid

---

[1] Newhall filed a chapter 11 petition on June 8, 2008 (Case No. 08-11125) and its case is being jointly administered with the cases of affiliated debtors under Case No. 08-11111 (Landsource Communities Development, LLC). *See* Order dated June 10, 2008 (Main D.I. #27). Reference to materials docketed in the above-captioned adversary proceeding are cited hereafter as "D.I. [#]." Reference to materials docketed under the main bankruptcy case, No. 08-11111, are cited hereafter as "Main D.I. [#]."

secured claims against the Debtors' estate, and the Defendants contend that their mechanic's liens remain secured, senior in priority, and enforceable. For the reasons set forth below, the Court will grant partial summary judgment in favor of Defendants AHL and R&R, and will deny summary judgment to Newhall.

## JURISDICTION

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of this matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(B) and (K). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409(a).

## BACKGROUND

Newhall, a land management company, executed pre-petition contractual agreements with AHL, a landscape contractor, and R&R, a general engineering contractor. The Defendants hold mechanic's liens, arising out of those pre-petition contractual agreements, against property purportedly owned by Newhall. On May 23, 2008, AHL recorded three mechanic's liens for "labor and material for landscaping and irrigation work": lien numbers 20080921053, 20090921054, and 20080921055. Compl. Ex. A, D.I. # 1. The AHL Liens are in the amount of $398,217.32. AHL lien number 20080921055 describes the encumbered property as "West Creek C Recreation Center – Lot 366, Tract 52455-01 (the "AHL Recreational Center Lien").

On June 6, 2008, R&R recorded three mechanic's liens against Newhall's property, for "supplying and installing pipeline and related services and materials": lien numbers 20081005958; 20081005959; and 20081005960, which was amended on June 12, 2008 by lien number 20081045588. Compl. Ex. B, D.I. # 1. The R&R Liens are in the amount of $634,470.98.

2

On June 8, 2008, LandSource Communities Development LLC and its affiliated debtors, including Newhall (collectively, the "Debtors"), each filed a voluntary petition for relief under Chapter 11 of the U.S. Bankruptcy Code in this Court. At the same time, the Debtors filed a Notice of Filing of Creditor Matrix, which included the Defendants. List of Creditors, p. 4 (AHL), p. 71 (R&R), Main D.I. #8.

The business of the Debtors, together with the non-debtor subsidiaries (referred to as "The LandSource Group"), was described in the Declaration of Donald L. Kimball ("First Day Declaration," Main D.I. # 10) as follows:

> The LandSource Group is a large and diversified land development company. Since its inception, it has managed over 35,000 homesites across the nation, including in the states of Arizona, California, Florida, New Jersey, Nevada and Texas.... Traditionally, the LandSource Group has focused on site acquisition within regions with high population and economic growth, where supply is limited, and where development can be readily supported by the LandSource Group's experienced development team.
>
> The LandSource Group's primary business is horizontal, rather than vertical, real estate development. Horizontal development involves the land planning, entitlement, development, construction and remediation necessary to transform undeveloped land into ready to build homesites for homebuilding and commercial land for developers. Horizontal development includes, among other things, obtaining all required regulatory approvals (including zoning changes and approval of a subdivision map), clearing land, moving soil, installing water, cable, and sewer lines, grading and paving roads and providing community amenities such as recreation centers and parks. Once these activities have concluded, the LandSource Group typically sells the property to a homebuilder or commercial real estate developer. A significant portion of the LandSource Group's horizontal development occurs within the context of master planned communities that are planned and developed by the LandSource Group.

First Day Declaration ¶¶ 5-6.[2]

---

[2] This Court may take judicial notice of its own docket since "Federal Rule of Evidence 201 authorizes a court to take judicial notice of an adjudicative fact 'not subject to reasonable dispute'...[and] so long as it is not unfair to a party to do so and does not undermine the trial court's fact finding authority." *In re Indian Palms Assocs.*, 61 F.3d 197, 205 (3d Cir. 1995).

3

On June 9, 2008, the Debtors filed a Motion to Approve Debtor-in-Possession Financing (the "DIP Motion"). Main D.I. # 18. The First Day Declaration described the proposed debtor-in-possession ("DIP") facility as follows:

> The DIP Credit Facility is comprised of (i) a senior Revolving Credit Facility of $135,000,000, including a letter of credit subfacility of up to $35,000,000 and a swing line facility of up to $10,000,000, and (ii) upon entry of a final order (the "Final Order"), a junior term loan, comprising the "roll-up" of up to $1,050,000,000 of prepetition obligations to the First Lien Lenders (the "Roll-Up"). If the Court enters the proposed form of interim order (the "Interim Order") pending a hearing on, and entry of, the Final Order, the Debtors will be authorized to borrow up to $35,000,000 from the Revolving Credit Facility.
>
> Borrowings under the Revolving Credit Facility will be secured by, among other things, priming liens on substantially all of the Debtors' property, senior in priority to the liens held by the Prepetition Lenders, and will also be afforded superpriority status. The term loan comprising the Roll-Up will, upon entry of the Final Order, also be secured by priming liens on the Debtors' property, senior in priority to the liens held by the Prepetition Lenders, though junior in priority to borrowings under the Revolving Credit Facility, and will also be afforded priority status, subject to certain permitted liens and a carve-out.
>
> The First Lien Lenders have consented to the Debtors' use of cash collateral in accordance with a budget annexed to the Interim Order, subject to the adequate protection set forth in the Interim Order. As adequate protection, the First Lien Lenders will receive (i) a superpriority claim to the extent of any such diminution, (ii) a junior lien on all assets of the Debtors subject to liens granted in favor of the First Lien Agent, (iii) the payment of the reasonable fees and expenses of First Lien Prepetition Agent, and (iv) upon entry of the Final Order, the Roll-Up. As a result of the consent of the First Lien Lenders, the Second Lien Lenders may not, pursuant to the terms of the Intercreditor Agreement, object to the use of the Debtors' cash collateral, although they may seek adequate protection from the Court.

First Day Declaration ¶¶ 55-57. On June 10, 2008, the Court entered an Interim Order on the DIP Motion. On June 11, 2208, the Debtors filed a Notice of the Interim DIP Order and Final DIP Hearing.[3]

---

[3] Notice of (i) Entry of Interim Order . . . and (ii) Hearing to Consider Entry of Final Order, dated June 11, 2008, Main D.I. # 47. The final DIP hearing was originally scheduled for June 30, 2008, with objections due by June 26, 2008. After an emergency motion by the Committee, the final hearing was rescheduled for July 14, 2008, with objections due by July 7, 2008. Emergency Motion by the Official Committee of Unsecured Creditors to (I) Continue the Final Hearing on the Debtors' Motion for Postpetition Financing and to Utilize Cash Collateral, (II)

On July 7, 2008, the Committee of Unsecured Creditors filed an objection to the Debtors' proposed DIP financing (the "Committee Objection," Main D.I. # 167), arguing that the DIP Motion was unclear about whether the Lender was seeking to prime existing mechanic's liens, and opposing the priming of existing mechanic's liens if such relief was being requested. Lennar Homes of California, Inc. ("Lennar Homes") also filed a statement objecting to the adequacy of notice regarding the proposed priming of existing mechanic's liens. Main D.I. # 185. A hearing to consider entry of a final order on the DIP Motion was held on July 14, 2008. Objections to the DIP financing were resolved, and a revised order was submitted under Certification of Counsel on July 18, 2008. Main D.I. # 290.

The Defendants, respectively, filed notices of perfection of their mechanic's liens pursuant to section 546(b) of the Bankruptcy Code: AHL's was filed on July 14, 2008[4], and R&R's was filed on July 17, 2008[5]. The Final DIP Order was signed on July 19, 2008, and docketed on July 21, 2008. Main D.I. # 306.

Newhall initiated this adversary proceeding on June 23, 2009, when it filed a complaint (the "Complaint," D.I. #1), seeking a determination that the Defendants do not hold valid secured claims against Newhall's estate. Compl. ¶2. Newhall's Complaint also asserted claims against

---

Extend the Objection Deadline Thereto and (III) Obtain Limited Waiver of Rules to Expedite Discovery, June 24, 2008, Main D.I. # 93; Amended Order Granting the Committee's Emergency Motion, June 25, 2008, Main D.I. # 107; Notice of Rescheduled Final Hearing on Debtors' Motion for Post-petition Financing, June 25, 2008, Main D.I. # 108.

[4] AHL's Notice of Perfection of Mechanic's Lien Pursuant to 11 U.S.C. § 546(b), Main D.I. # 270. The Certificate of Service [Attachment 1 to AHL's Notice of Perfection] states that the Notice of Perfection was sent by first class mail on July 11, 2008. The docket reflects that the Notice of Perfection was received by the clerk's office on the morning of July 14, 2008, and was docketed on July 15, 2008. The Notice of Perfection states that AHL does not waive any of its rights and reserves the right to enforce its mechanic's liens. AHL Notice 1-3.

[5] R&R's Notice of Continued Perfection of Lien, Main D.I. # 284. The Certificate of Service states that the Notice of Perfection was sent by first class mail on July 11, 2008. The docket reflects that the Notice of Perfection was received by the clerk's office on the morning of July 17, 2008, and was docketed on July 18, 2008. In the Notice of Perfection, R&R stated that it "intends to enforce said liens to the fullest extent as allowed by Bankruptcy Law and California State Law." R&R Notice 6.

two other mechanic's lien-holders, Granite Construction Company and C.A. Rasmussen, Inc., in addition to the Defendants. These other claims were disposed of before the filing of the present cross-motions.[6] Therefore, the only remaining claims concern the Defendants:

(1) Claim 1, filed against AHL, seeks a declaratory judgment that the AHL Liens were primed by the DIP Liens[7];

(2) Claim 2, also filed against AHL, seeks a declaratory judgment that AHL does not hold any secured claims against Newhall's estate on account of AHL's Recreation Center Lien; and

(3) Claim 3, filed against R&R, seeks a declaratory judgment that the R&R Liens were primed by the DIP Liens.

The Second Amended Chapter 11 Plan of Reorganization was confirmed on July 20, 2009. The Defendants had filed timely Proofs of Claim and were listed as "Disputed Permitted Liens" in the Confirmed Plan.[8]

On August 21, 2009, the Defendants filed separate Answers and Defenses to Newhall's Complaint. The parties engaged in discovery in accordance with the Scheduling Order. D.I. # 25. On March 31, 2010, the parties attended a mediation conference, but failed to resolve their disputes.

---

[6] On September 21, 2009, the Court entered an Order granting the Debtors' Motion for Default Judgment with respect to Defendant C.A. Rasmussen, Inc. D.I. # 19. On the same day, the Court entered an Order and Judgment approving the Stipulation Resolving the Adversary Proceeding with respect to Defendant Granite Construction Co. D.I. # 20.

[7] The DIP Liens are those liens securing Newhall's obligations under that certain Super-Priority Debtor-in-Possession First Lien Credit Agreement (the "DIP Credit Agreement"), dated as of June 16, 2008, and approved by the Final DIP Order. See Irgens Decl. Ex. D, D.I. # 85.

[8] R&R's Proof of Claim #355, received on October 27, 2008, lists the total amount of R&R's claim as $629,475.98. Irgens Decl. Ex. H, D.I. # 85. AHL's Proof of Claim #912, received on November 12, 2008, lists the total amount of AHL's claim as $445,241.42. Irgens Decl. Ex. L, D.I. # 85.

The Defendants and Newhall filed cross-motions for summary judgment on April 16, 2010. In their respective motions, Newhall asserts that the Defendants' mechanic's liens were primed by the DIP Liens pursuant to the Final DIP Order, while the Defendants contend that their mechanic's liens were not primed by the DIP Liens. Oral argument on the Motions was held on September 30, 2010, during which time I requested supplemental briefing, in letter form, regarding the application of *In re Mansaray-Ruffin*, 530 F.3d 230 (3d Cir. 2008), to this case.[9]

## LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure, provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Materiality "is determined by the substantive law," and a dispute over a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must resolve all doubts and consider the evidence in the light most favorable to the nonmoving party. *Id.* at 255 ("the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor"); *see also United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

---

[9] Oral Arg. Tr. 18:4-6, 40:9-14, Sept. 30, 2010, D.I. # 105. In *Mansaray-Ruffin*, the Court of Appeals for the Third Circuit held that neither a chapter 13 plan nor an unsecured proof of claim filed by the debtor on behalf of a mortgagee could invalidate a mortgage lien, but that Rule 7001(2) of the Federal Rules of Bankruptcy Procedure provides, and due process considerations require, the use of an adversary proceeding for such purpose. Newhall argues that *Mansaray-Ruffin* does not apply here, because the matter before the Court involves *priming* a lien under Bankruptcy Code §364(d), which is subject to the procedures of Fed.R.Bankr.P. 4001( c) and Local Bankruptcy Rule 4001-2. The Defendants argue that, consistent with the due process concerns of *Mansaray-Ruffin*, the Defendants were entitled to the protections of Bankruptcy Code §364(d) and Fed.R.Bankr.Pl. 4001( c), but the Debtors failed to satisfy their burden of demonstrating adequate protection. In light of my reasoning, below, for the disposition of the cross-motions for summary judgment, I need not reach the question addressed by the Court in *Mansaray-Ruffin*.

The moving party always bears the burden of establishing the absence of a genuine dispute as to a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.") (citing Rule 56). Where the nonmoving party bears the burden of persuasion at trial, the moving party "may meet its burden…by showing that the nonmoving party's evidence is insufficient to carry that burden." *Foulk v. Donjon Marine Co., Inc.*, 144 F.3d 252, 258 n.5 (3d Cir. 1998) (quoting *Wetzel v. Tucker*, 139 F.3d 380, 383 n.2 (3d Cir. 1998)).

Once the moving party has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Summary judgment cannot be avoided by introducing only "a mere scintilla of evidence," *Sarko v. Penn-Del Directory Co.*, 968 F. Supp. 1026, 1031 (E.D. Pa. 1997) (citation omitted), *aff'd*, 189 F.3d 464 (3d Cir. 1999), or by relying on "conclusory allegations, improbable inferences, and unsupported speculation." *J. Geils Band Emp. Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1251 (1st Cir. 1996); *accord Solt v. Alpo Petfoods, Inc.*, 837 F. Supp. 681 (E.D. Pa. 1993), *aff'd*, 30 F.3d 1488 (3d Cir. 1994). Rather, the nonmoving party must point to specific evidence of record that demonstrates a genuine issue for trial. *Celotex*, 477 U.S. at 324.

Consideration of competing motions for summary judgment does not change this standard. As stated by the Third Circuit, "'[c]ross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory

claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'"*Lawrence v. City of Philadelphia,* 527 F.3d 299, 310 (3d Cir. 2008) (quoting *Rains v. Cascade Indus., Inc.,* 402 F.2d 241, 245 (3d Cir. 1968)).

## DISCUSSION

Newhall seeks a declaration that the Defendants do not hold valid secured claims against the Debtors' estate under section 506(a) of the Bankruptcy Code. Newhall does not contest the amounts of the Defendants' mechanic's liens, or that the liens arose out of contractual agreements between Newhall and the individual Defendants, or that the work was done on Newhall's behalf.[10] Rather, Newhall's position is (i) because the Defendants failed to file a formal objection to the DIP Motion, their mechanic's liens were primed by the DIP liens, and (ii) because the Debtors' obligations under the DIP Credit Agreement exceed substantially the value of the collateral securing the DIP Liens,[11] then, as a matter of law, under section 506(a), the Defendants do not hold valid secured claims against Newhall's estate. Additionally, Newhall contends that even if the mechanic's liens were not primed, AHL would not have a secured claim against Newhall's estate on account of the Recreation Center Lien, because Newhall neither owns, nor has any interest in, the property encumbered by that lien.

The Defendants argue that their mechanic's liens should be considered "Permitted Liens," not "Primed Liens," as those terms are defined in the DIP Credit Agreement. Permitted Liens are defined as:

---

[10] Oral Arg. Tr. 10:11-18, Sept. 30, 2010, D.I. # 105.

[11] "Collateral" is defined in the DIP Credit Agreement to mean "at any time, any assets owned by the Borrower, any Guarantor or any other DIP Loan Party (other than Exempt Assets) that are subject to a Lien in favor of the Administrative Agent for the benefit of the Secured Parties as security for the Obligations. DIP Credit Agreement, p. 6, Main D.I. #18, Ex. A.

9

> any Liens that would otherwise be Primed Liens, to the extent the holder of such Lien files an objection or other responsive pleading with the Bankruptcy Court to such Lien being a Primed Lien at any time prior to the entry of the Final Order.

DIP Credit Agreement, p. 19, Main D.I. # 18, Ex. A. Primed Liens are defined as:

> any other Lien securing obligations as to which the secured creditor in respect thereof is provided with adequate notice of the relief requested in the Orders and an opportunity to be heard before the Bankruptcy Court, and does not file an objection or other responsive pleading with the Bankruptcy Court objecting to the priming of such Lien by the Liens securing the Obligations at any time prior to entry of the Final Order.

*Id.*, p. 20-21. Alternatively, the Defendants contend that their liens were not primed by the DIP Liens due to the inadequacy of notice. Finally, AHL argues that the AHL Recreation Center Lien is valid because it attaches to the property rights that Newhall retained in the land, as well as to the surrounding lots in the same common development scheme.

Newhall contends that the Defendants' liens fall under the category of Primed Liens because neither AHL nor R&R filed an objection to the DIP Motion. Newhall argues that the Defendants' failure to file a formal objection constitutes tacit consent to the priming of the mechanic's liens by the DIP Liens.

In response, the Defendants deny that they were required to file objections to preserve their priority; but assert that, even if a filing was required, the filing of their section 545(b) Notices of Perfection prior to the entry of the Final DIP Order was sufficient to deem their liens part of the Permitted Liens. The Defendants argue that the Notices of Perfection "indisputably manifest Defendants' intentions to maintain the priority of their mechanic's liens" and "are 'other responsive pleadings' that were filed prior to the entry of the Final DIP Order."[12]

---

[12] Defs.' Resp. in Opp'n to Pl.'s Mot. Summ. J., 3, D.I. # 88.

The context in which this dispute arose must be considered against the backdrop of debtor-in-possession financing, particularly as it relates to the Debtors' business. A leading treatise describes DIP lending dynamics as follows:

> In any extension of debt financing under section 364, traditional issues such as borrowing conditions, interest rates, loan fees, covenants and remedies upon default will have to be negotiated. Often the debtor in possession will be able to obtain only onerous terms, which the bankruptcy court must balance against the debtor in possession's apparent lack of alternatives.
>
> On the other hand, a prepetition secured lender is often at risk if the debtor in possession is not able to obtain financing and must cease operations. Typically, a creditor's collateral will liquidate for more if sold as part of a going concern business. So a prepetition lender who is providing postpetition financing to protect its collateral position has an incentive to make sure that it does not demand too much, lest the bankruptcy court not approve the postpetition financing and cause the business to close and the collateral value to be lost. Although the debtor in possession may not have sufficient leverage to push back too hard, **the bankruptcy court, in its role as final arbiter of whether the financing should be approved, often acts as the last and perhaps most effective negotiator against the secured lender. It is an awkward position for a judge who is supposed to resolve disputes and not become involved in the administration of the business of the estate, but it perhaps has become essential given the nature of the process.**

Collier on Bankruptcy ¶ 364.04[2][d] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (emphasis added). DIP lenders expect, understandably, to be able to rely on the efficacy of final financing orders. Here, due especially to the nature of the Debtors' business, the importance of identifying valid, pre-existing liens, which, if "Permitted Liens," would fall ahead of any DIP financing liens, is obvious. It is also important that court-imposed objection deadlines in connection with financing requests be respected and that the failure to meet such deadlines carry consequences. However, I am loathe to allow incineration of valid liens, clearly falling within the safe harbor of Section 546(b), in light of the lienholders' undisputed efforts to assert their rights.

In the particular circumstances before me, I conclude that the section 546(b) notices filed by the Defendants were sufficient to alert Newhall that they opposed the priming of their liens by the DIP Liens. The Defendants' Notices of Perfection were sent and filed before entry of the Final DIP Order. Here, the record does not support a finding that the Defendants waived their rights or consented tacitly to the priming of their liens. The Defendants hold Permitted Liens; therefore, I need not address the parties' other arguments with respect to Claims 1 and 3 of the Complaint.

In Claim 2 of the Complaint, Newhall disputes AHL's Recreation Center Lien, arguing that it neither owns, nor has any interest in the encumbered real property. That issue is not ripe for summary judgment because the parties dispute the relevant material facts.

California law permits a lien on a common area to attach to other lots in a common interest development if the use of the larger area "is required for the necessary and convenient use" of the common area. *Anselmo v. Sebastiani*, 26 P.2d 1, 9 (Cal. 1933). Section 3128 of the California Civil Code describes the property upon which a mechanic's lien may attach, and provides, in relevant part, that "[t]he liens provided for in this chapter shall attach to the work of improvement and the land on which it is situated together with a convenient space about the same or so much as may be required for the convenient use and occupation thereof...." Cal Civil Code § 3128 (West 2012).[13]

According to Newhall, the AHL Recreation Center Lien encumbers property that was not owned by Newhall as of the date on which that lien was recorded. AHL argues that Newhall retained some ownership interest in the land associated with the AHL Recreation Center Lien,

---

[13] According to the Law Revision Commission Comments, "As of July 1, 2012, former Title 15 (former Sections 3082-3267) [was] replaced by new Part 6 (Sections 8000-9566) of Division 4 of the Civil Code." "Section 8440 restates the parts of former Sections 3128 and 3112 that described property subject to the lien, without substantive change. A reference to 'real property' is substituted for references to 'land.'" Cal. Civ. Code § 8440.

and therefore, AHL's lien attached to the property rights that Newhall retained with respect to the land, including rights to minerals, oil, hydrocarbons, natural gas, water, and rights of way. Newhall contends that under California law, the AHL Recreation Center Lien does not attach to those property interests because such "land" is not required for the necessary and convenient use of the recreation center.

Resolving this issue requires a factual determination whether the land associated with the Recreation Center Lien is essential for the convenient use and occupation of the surrounding lots. The Court finds that this issue is not ripe for determination because the factual dispute over the use of the land in question precludes a decision on summary judgment.

## **CONCLUSION**

Accordingly, with regard to Claims 1 and 3 of the Complaint, as the Court has determined that the Defendants' liens were not primed by the DIP Liens, the Court grants summary judgment in favor of the Defendants and denies summary judgment to Newhall. As for Claim 2, which concerns whether AHL holds a perfected lien on, or any other interest in, Newhall's property on account of AHL's Recreation Center Lien, the Court concludes that a genuine dispute exists as to the relevant material facts and that this matter is not ripe for summary judgment. An appropriate Order follows.

BY THE COURT:

KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated: August 30, 2012